# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| FEDERAL TRADE COMMISSION and<br><br>PEOPLE OF THE STATE OF ILLINOIS,<br><br>    Plaintiffs,<br><br>    v.<br><br>GRUBHUB INC., a corporation, and<br><br>GRUBHUB HOLDINGS INC., a corporation,<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |

## <u>COMPLAINT</u>

Plaintiffs the Federal Trade Commission ("FTC" or "Commission"), and the People of the State of Illinois, by Kwame Raoul, Illinois Attorney General, for their Complaint allege:

1.      The FTC brings this action for Defendants Grubhub Inc. and Grubhub Holdings Inc.'s violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a); the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8401 *et seq*.; the FTC's Trade Regulation Rule entitled "Impersonation of Government and Businesses" ("Impersonation Rule"), 16 C.F.R. pt. 461; and for Defendants' participation in acts and practices that the Commission has previously determined to be unfair and deceptive, in connection with their sale of food ordering and delivery services. For these violations, the FTC seeks relief, including permanent injunctive relief and monetary relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 53(b), and 57b; and ROSCA, 15 U.S.C. § 8404.

2.      Plaintiff People of the State of Illinois, as part of the same case or controversy, also brings this action for Defendants' violations of the Illinois Consumer Fraud and Deceptive

Business Practices Act, 815 ILCS 505 ("Consumer Fraud Act"), and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510. The Attorney General of the State of Illinois brings this action under Section 7 of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/7) to obtain a permanent injunction, restitution, and civil penalties against Defendants.

## SUMMARY OF THE CASE

3.      Grubhub Inc. and Grubhub Holdings Inc. (together, "Grubhub") operate Defendants' online food ordering and delivery service. Grubhub allows diners to browse thousands of restaurant offerings and order food for delivery or pickup from those restaurants by using a single, consolidated platform. Grubhub's platform includes the food ordering and delivery system under the Seamless brand, which Grubhub acquired through a merger in 2013—one of multiple acquisitions that have contributed to its growth.

4.      Grubhub has grown enormously over the last decade, becoming one of the largest online ordering and delivery services in the country. It operates in over 2,400 U.S. cities, with more than 500,000 restaurants on its platform, and over 200,000 delivery drivers. Each year, approximately 31 million active diners place 262 million orders through Grubhub.

5.      As a digital platform, Grubhub had to achieve a critical mass of customers in order to gain scale. The more restaurants it signed up, the more diners would be likely to use Grubhub—and more diners, in turn, would draw more restaurants. More business meant more reviews, more data, and other benefits that would turbocharge Grubhub's momentum and allow it to experience accelerated growth.

6.      Faced with these incentives, Grubhub resorted to dishonesty and underhanded tactics in its quest to gain scale. It has consistently misled and mistreated the market participants it relies on to do business: the diners that place food orders through Grubhub's platform, the

2

restaurants whose offerings Grubhub markets and delivers, and the drivers who deliver the orders made through Grubhub.

7.      Grubhub harms diners by deceiving them about how much its services cost, promising one price but charging more through hidden fees. A former Grubhub executive has even described these tactics as "pricing shell games." Grubhub first baits diners with a single, low-cost (or no-cost) delivery charge on its landing, browse, search, and ordering pages. Enticed by this low fee, diners proceed to search for restaurants, make a selection, and populate their bags with menu items. At each step in the process, Grubhub continues to present diners with that same low-cost fee, leading diners to believe that this fee represents the total cost of Grubhub's services. Once diners reach the checkout screen, though, Grubhub then saddles them with additional undisclosed fees for the same services. These hidden fees are hefty, often doubling the advertised cost of delivery. Grubhub's tactics draw in diners who might have been put off by the actual, and much higher, cost of using Grubhub's services. Grubhub's misleading promises generate hundreds of millions of dollars in annual revenue for the company. In a single year, Grubhub pocketed close to half a billion dollars through just one of these hidden fees.

8.      Grubhub also uses deceptive enrollment and cancellation tactics to lock diners into Grubhub+, its monthly subscription service. Grubhub touts that subscribers will enjoy "free delivery" or "$0 delivery"—that is, they will not pay Grubhub a charge for food delivery. That, however, is false: Grubhub+ subscribers are subject to many of the same undisclosed fees that non-subscribers must pay. Once diners join through the easy enrollment process, Grubhub traps them into the subscription by making it difficult to cancel.

9.      Grubhub also denies diners' use of their Grubhub accounts and gift card funds. Grubhub frequently flags diners with multiple or high gift card balances, cancels the diners' orders, and blocks them from placing further orders, which prevents them from using their gift

card balances and other credits. Unlike legitimate efforts to prevent fraud, Grubhub's tactics allow it to seize and pocket diners' money for itself. Grubhub routinely fails to provide diners with any notification that their accounts are blocked or any means to restore access to their frozen funds. As a result, Grubhub often permanently denies those diners the use of their legitimate gift cards, effectively confiscating diners' money. For years, thousands of consumers have complained about Grubhub's undisclosed and irremediable account blocks, which have remained among the top sources of consumer discontent.

10.     With respect to restaurants, Grubhub relies on partnerships to build out its platform offerings. But it has fueled its dramatic growth by falsifying hundreds of thousands of its restaurant affiliations, listing restaurants on its platform without their knowledge or consent ("Unaffiliated Restaurants"). Grubhub has no relationship with these Unaffiliated Restaurants, but it falsely represents that it is affiliated with them by creating listings for them and accepting diners' orders from those restaurants. For Grubhub, these misrepresentations are a quick and cheap way to add restaurant offerings and build scale. But Grubhub's deception harms restaurants and diners alike. Orders from these restaurants regularly result in higher charges to diners, delivery delays, cancellations, order inaccuracies, and other problems, for which diners—unaware that the restaurants are unaffiliated with Grubhub—inevitably blame the restaurant rather than Grubhub.

11.     Grubhub executives pursued these fake affiliations as a core part of Grubhub's growth strategy, describing it as a "mechanism to gain national scale." At one point, over *half* of all the restaurants on Grubhub's platform—more than 320,000 of approximately 610,000 restaurants—were Unaffiliated Restaurants listed without authorization.

12.     Restaurants that learn they are on Grubhub's platform without authorization often demand to be removed, but Grubhub typically stalls and tries to sell them a paid partnership

instead. Thousands of restaurants have sent legal demands to Grubhub requesting to be removed from the platform. Often, the only way Grubhub will remove the restaurants is if they threaten legal action or go to the press.

13.     Finally, Grubhub has relied on hundreds of thousands of drivers to accommodate its growth. But rather than attracting drivers through offering better opportunities, Grubhub has lured them by misrepresenting their potential earnings. Grubhub has advertised to potential drivers that they are likely to attain lucrative hourly earnings, such as $26 per hour. In reality, the vast majority of drivers never earn the advertised amounts. The median Grubhub driver earned only $11 per hour in 2023, and only the top 2% of drivers actually earn the promised hourly rates. Grubhub has known for years that its earning claims are not substantiated, but continued deceiving drivers rather than correcting its claims.

14.     Grubhub has long been aware of the harms caused by these problematic diner, restaurant, and driver-facing practices, which have generated hundreds of thousands of consumer complaints. Nevertheless, Grubhub has persisted with these practices—choosing to chase scale through misleading and mistreating consumers rather than through honest competition.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

16.     This Court has supplemental jurisdiction over the State of Illinois's claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

**PLAINTIFFS**

18.     The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Restore Online Shoppers' Confidence Act, 15 U.S.C. § 8401 *et seq.*, which prohibits a party from charging for certain online transactions unless it has clearly disclosed all material terms of the transaction; and the Impersonation Rule, 16 C.F.R. pt. 461, which prohibits the impersonation of government, businesses, and their officials or agents in interstate commerce.

19.     The State of Illinois is one of the fifty sovereign states of the United States. Attorney General Kwame Raoul is the duly elected and qualified Attorney General, acting for the Plaintiff State of Illinois, and brings this action in his official capacity for and on behalf of the People of the State of Illinois, pursuant to the Provisions of the Consumer Fraud Act, 815 ILCS 505/7, and his common law authority as Attorney General to represent the People of the State of Illinois.

20.     The Illinois Attorney General believes this action to be in the public interest of the citizens of the State of Illinois and brings this lawsuit pursuant to Section 7(a) of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7(a).

**DEFENDANTS**

21.     Defendant Grubhub Inc. is a Delaware corporation with its principal place of business at 111 W. Washington Street, Suite 2100, Chicago, Illinois 60602. Grubhub Inc. transacts or has transacted business in this District and throughout the United States. Grubhub Inc. is a wholly owned subsidiary of Just Eat Takeaway.com N.V. ("Just Eat Takeaway"), a Netherlands corporation.

22. Defendant Grubhub Holdings Inc. is a Delaware corporation with its principal place of business at 111 W. Washington Street, Suite 2100, Chicago, Illinois 60602. Grubhub Holdings Inc. transacts or has transacted business in this District and throughout the United States. Grubhub Holdings Inc. is a wholly owned subsidiary of Defendant Grubhub Inc.

23. Grubhub Inc. and Grubhub Holdings Inc. (together, "Grubhub") operate Defendants' online food ordering and delivery service. At all times relevant to this Complaint, acting alone or in concert with others, the Grubhub entities have advertised, marketed, distributed, and sold goods and services to diners and restaurants, and have also advertised and marketed delivery-driver jobs to potential workers.

## COMMON ENTERPRISE

24. Defendants Grubhub Inc. and Grubhub Holdings Inc. have operated as a common enterprise while engaging in the unlawful acts and practices and other violations of law alleged below. The Grubhub entities have conducted the business practices described in this Complaint through a network of interrelated companies that have common ownership, officers, managers, business functions, employees, and office locations, and that commingled funds. Because the Grubhub entities have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

25. At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Illinois Consumer Fraud Act, 815 ILCS 505/1(f).

## DEFENDANTS' BUSINESS ACTIVITIES

26. Grubhub describes itself as the "leading online and mobile food-ordering and delivery marketplace with the largest and most comprehensive network of restaurant partners."

27.     Grubhub connects diners and restaurants. Diners across the country search for and order food from restaurants for pickup and delivery using Grubhub's desktop and mobile applications. Restaurants pay to be listed on Grubhub's platform and for other services, including food delivery.

28.     Under Grubhub's business model, the company earns revenue both from diners and restaurants.

29.     Grubhub charges fees to diners that are assessed on a per-order basis.

30.     Restaurants, for their part, pay commissions of approximately 15-20% per order to be listed on Grubhub's platform and to allow Grubhub to process orders on their behalf. Restaurants that choose to use Grubhub's optional delivery services pay additional fees of approximately 10% per order.

31.     Grubhub offers delivery services in over 600 geographical areas, including delivery service areas within the State of Illinois, covering over 2,400 cities and more than 85% of the United States population. To carry out these services, Grubhub engages over 200,000 delivery drivers around the country.

32.     Grubhub classifies its delivery drivers as independent contractors rather than employees. Grubhub requires drivers to provide their own cars, gas, insurance, and maintenance, and it pays drivers for each order they accept and complete.

33.     Grubhub has engaged in a series of illegal practices directed at diners, restaurants, and drivers alike.

## I.     <u>Grubhub Lures Diners by Misrepresenting Delivery Fees</u>

34.     Since at least 2019, Grubhub has obscured from diners the true cost of its services—a tactic that a former executive has conceded is a "pricing shell game." For years, Grubhub has advertised that diners will pay a single, low-cost amount for Grubhub's services in

connection with a delivery order. In reality, Grubhub tacks on additional undisclosed fees for those same services—resulting in a final price that is often more than double what it originally advertised.

**A.      Grubhub Advertises a Single, Low-Cost Fee for Its Services**

35.      To entice consumers to order from Grubhub, the company prominently advertises a single, flat fee in connection with a delivery order. Grubhub's advertised fee is low, typically ranging from $0 to $5.99.

36.      When diners arrive at Grubhub's landing page, in some instances, they may see Grubhub touting that diners can "order online for free"—suggesting that diners will not pay any fees to use its food-ordering services.

**Figure 1.**



37.      Next, when diners begin searching or browsing for restaurants on Grubhub's desktop platform, Grubhub displays a single, low-cost or zero-dollar delivery fee. In the search and browse view shown below, for instance, diners see the associated fee for delivery orders from each restaurant, ranging in this scenario from "$0 delivery" to "$2.49 delivery." The fee for Palenque Colombian Food, for example, is advertised as "$2.49 delivery."

**Figure 2.**



38. After selecting a restaurant from Grubhub's browse and search pages, a diner lands on the specific restaurant's site, like the one from Palenque shown below. This page features a digital menu and other restaurant information, like the address, telephone number, rating, and delivery time.

**Figure 3.**



10

39. Once a diner has decided to order from a particular restaurant, she begins adding menu items to her "bag." Clicking the shopping bag icon at the top right of the screen, as shown in the figure below, reveals the "bag" window that displays all the food items a diner has selected.

**Figure 4.**



40. Grubhub's "bag" window shows the cost of the selected food items in the "Items subtotal" line, as depicted above. The "Items subtotal" line does not show the advertised fee, which instead appears towards the top of the bag, in inconspicuous, small, light gray font against a white background. In the Palenque example, for instance, a diner sees only "$2.49 delivery," which is the same fee that was advertised in the search and browse page.

41. When a diner has finished selecting menu items, Grubhub directs her to "Proceed to Checkout" by clicking the large green button at the bottom of the bag window depicted above.

Clicking this button reveals the checkout page shown below. The bag window appears at the top right of the screen and features a bright green button prompting the diner to "Place your delivery order."

**Figure 5.**



42.     Many diners proceed to place their order by clicking the green "Place your delivery order" button, believing that they are charged for the items they ordered, plus the advertised delivery fee, taxes, and any tip they choose to leave for the driver. Grubhub charges consumers each of those amounts. But unbeknownst to many consumers and unexpectedly to others, Grubhub also charges substantial hidden fees that can force diners to pay double or triple the advertised cost of delivery.

43.     Grubhub calls these fees a "service fee" and a "small order fee." In reality, consumers do not get anything additional in return for these fees, as Grubhub treats them as part of the cost of delivery—even though it omits these costs from the advertised "delivery fee."

Indeed, the "service fee," in Grubhub's words, is "directly tied to the act of delivering (i.e. it is another form of delivery fee)." And for accounting purposes, Grubhub treats the two fees as part of the same delivery fee, explaining that "delivery fee + service fee = the restaurant's delivery fee." In an internal discussion about the service fee when Grubhub first introduced it, Grubhub gave the example that, "a restaurant that normally charges a $4 delivery fee" could "instead have a $1 delivery fee and a $3 service fee." Likewise, the "small order fee" is an extra delivery charge Grubhub adds to the advertised delivery fee for orders under an unstated minimum.

44.     For many years, Grubhub charged diners the single advertised delivery fee. In or around 2019, Grubhub adopted a new ploy to lure in more customers: advertise a lower "delivery fee" but then move a portion of the delivery fee into a new "service fee" that is tacked on at the end.

45.     Grubhub does not reveal these reshuffled delivery fees to consumers when they are searching for restaurants or even choosing food items. Instead, the first time in the ordering process that Grubhub includes any information about these fees is at the end—after consumers have already spent considerable time and effort searching for a restaurant and selecting items to order. For example, below the "Place your delivery order" button in the bag window in Figure 5, Grubhub displays the diner's selected menu items, as well as the previously advertised $2.49 "delivery fee." Beneath the delivery fee, however, in small, faint print is the ambiguously labeled "Other fees."

46.     Grubhub does not describe those "Other fees" on the face of the checkout page itself. Only consumers who notice and click on a small "i" next to "Other fees" see two hidden fees, which Grubhub calls a "service fee" and a "small order fee." Other consumers never notice the "Other fees" line item at all.

47.     These hidden fees can more than double the original advertised cost of using Grubhub's delivery service. For instance, after adding these hidden components of Grubhub's delivery fees, the diner in the Palenque example ends up paying $7.49 in fees, not the $2.49 that Grubhub advertised.

48.     At no point before the final check-out screen does Grubhub tell the consumer about these additional fees or that it will ultimately charge more than the delivery fee it originally advertised. Nor is there any way for a consumer to avoid these extra charges; Grubhub mandates them as part of the cost of delivery.

**B.      Grubhub Is Aware Its Advertised Fee Is Deceptive**

49.     Top executives directed the efforts in 2019 to hide fees from consumers and grow the business, and even called Grubhub's fee structure a "pricing shell game."

50.     As part of that "shell game," Grubhub artificially lowered its advertised delivery fee, knowing that this fee is diners' "pain point"—that is, the cost that is top of mind for diners. To lure diners and create the false impression of lower delivery fees, Grubhub renamed some of its "delivery fee" as a new "service fee." Indeed, when instituting the service fee in 2019, Grubhub assured restaurants that diners' delivery costs would remain the same—the delivery fee would just be split into two. In a 2019 communication, Grubhub told restaurants that it was testing different ways to present the delivery fee, which would now be "split into both a 'delivery fee' and 'service fee.'" But it assured restaurants that, "in *every* case," the "total fees charged to the diner will be exactly the same as before."

51.     In addition, Grubhub hid the "service fee" from diners. In 2019, it displayed the fee early in the ordering process—including on the restaurant menu page and bag view. Grubhub also displayed the small order fee in the bag view. Soon thereafter, however, Grubhub removed the service fee and small order fee from those pages. Grubhub also removed other information

14

about the fees entirely, such as how they were calculated (for example, that the service fee was 17% of the food order). Grubhub made these changes even though its market research confirmed that diners preferred "straightforward pricing."

52.     Grubhub knew these "pricing shell game features" were essential to attracting more diners. Pointing to an Uber Eats advertisement promoting a $0 delivery fee—while hiding the true cost—a former executive noted that this tactic "*is* working for [Uber Eats] and others and we need to figure out how to make this stuff work for us ASAP because we are just leaving opportunity on the table (literally) while likely losing out on potential new diners that react to this messaging." Those diners, in particular, are more inclined to place an order when they see a lower delivery fee.

53.     Grubhub was also well aware that its pricing tactics were deceptive. Indeed, a former executive acknowledged that the strategies were "misleading, eroding trust," and "truly more expensive" for the diner. He recognized that Grubhub could take the "intellectually honest" course: "conclude that everyone else [using these tactics] is wrong" and "get super aggressive in the press" to explain that these "pricing tactics" are "like a car company selling a car for FREE, but charging you the full value of the car for the 'engine.'" Ultimately, however, the executive concluded that was a "highly unlikely" path, and his "strong bias" was to continue charging misleading but lucrative fees.

54.     Unsurprisingly, if diners discover that delivery costs more than Grubhub advertises, they often complain. As one diner and shareholder recounted to Grubhub, the reshuffled fees make ordering online "laborious," as it "takes me upwards of 45 minutes" to place an order. He explained that, "to identify what the delivery fee is, I will typically choose a restaurant, add a random item to the bag, go to the checkout page to see what the fee is," all of which "takes a LOT of time." This process, the customer explained, "is BEYOND frustrating."

55.     Grubhub's deceptive pricing tactics are highly lucrative. The company's market research confirms that lower delivery fees draw in diners, because that fee is "most top-of-mind when thinking about the cost of ordering delivery." Once locked in, the diners become "oblivious to service fees," which are "baked into the product."

56.     As such, around the time Grubhub launched its service fee, a former executive confirmed that Grubhub found a "significant increase in conversion"—that is, the rate at which diners complete an order—by reducing the delivery fee and "introducing a service fee for the remainder." This, he proclaimed, is a "MASSIVE increase for diner productivity—far larger than any other [test] we have executed and there is NO change to actual diner fees."

57.     Grubhub has shifted a substantial portion of the cost to use its delivery platform to its hidden service fee. It is integral to Grubhub's business and has become the highest-grossing diner fee. Indeed, in 2022, Grubhub earned $482 million from "service fees" alone—significantly more than the $293 million it earned in delivery fees.

**II.     To Lure and Lock Diners Into Its Subscription Program, Grubhub Uses Deceptive Enrollment Tactics and Obstructs Cancellation**

58.     Since early 2020, Grubhub has offered diners a subscription plan called Grubhub+. The subscription costs $9.99 per month plus taxes, and it auto-renews every month unless consumers cancel.

59.     To entice subscribers to sign up for Grubhub+, Grubhub touts free delivery—and in many instances, "unlimited free delivery"—as the key perk. That is misleading: subscribers' delivery orders are not actually free because Grubhub charges numerous fees, including a service fee, a small order fee on orders less than $12, and a delivery fee on orders from restaurants that do not participate in Grubhub+.

60.     Once Grubhub lures diners into enrolling in Grubhub+, it obstructs their ability to cancel by failing to provide an easy cancellation mechanism. Grubhub buries the cancellation

option behind a series of pages in consumers' account settings that many consumers have difficulty locating. In contrast to the easy one- or two-click enrollment process, the cancellation process is difficult and complicated. And as Grubhub is aware, its design has proven successful in thwarting consumers' cancellation attempts: it has received numerous consumer complaints reporting difficulty canceling.

**A.** **Grubhub Falsely Promises Free Delivery and Fails to Disclose Applicable Fees**

61. Since launching Grubhub+, Grubhub has prominently promoted free delivery as the membership's key feature. After identifying the delivery fee as diners' "pain point," Grubhub focused on attracting diners to its subscription program using the promise of "unlimited free delivery."

*i.* **Grubhub Advertisements Have Falsely Touted "Unlimited Free Delivery"**

62. Grubhub widely markets its subscription service online, including on platforms such as YouTube, TikTok, Facebook, and Instagram. These advertisements feature the promise of free delivery. For example, in a YouTube advertisement like the one shown below, celebrities promote "unlimited free delivery" for "thousands of restaurants."

**Figure 6.**



63. Similarly, some advertisements, like the TikTok one below, emphasize that Grubhub+ subscribers will never "ever pay for food delivery fees."

**Figure 7.**



64. In fact, that is not true. Grubhub charges Grubhub+ subscribers for delivery both on orders from the many restaurants on its platform that are not part of the Grubhub+ program—a limitation that Grubhub nowhere discloses—and for orders from all restaurants through its "service" and "small order" fees.

65. Grubhub continued to use deceptive "free delivery" advertisements even after receiving the FTC's Civil Investigative Demand in an investigation into the company's practices. And although, in some instances, Grubhub added—only after it learned of the investigation—a vague, inconspicuous statement that "additional fees may apply," Grubhub hides this information in tiny font surrounded by brightly colored graphics.

66. For example, the following Facebook advertisement features "$0 delivery fees with Grubhub+" in large, bold text.

**Figure 8.**



The phrase "Terms and add'l fees apply" appears below only as an afterthought, in barely legible text next to a large, distracting image of tacos.

### ii. Grubhub's Platform Emphasizes the False Free Delivery Promise

67. Consumers lured by the deceptive Grubhub+ advertising are bombarded with further "free delivery" misrepresentations once they arrive on Grubhub's platform. Throughout the meal ordering and checkout process, Grubhub's mobile application and website flood diners with content reinforcing the impression in the advertisements—that Grubhub+ subscribers receive free delivery. For example, as shown in the screenshot below, the top of the home screen on the Grubhub application features a Grubhub+ banner that encourages diners to sign up to "Unlock $0 delivery fees."

**Figure 9.**



68.     Similarly, on the restaurant search results page at the start of a consumer's ordering process, many restaurant listings—like those pictured below—have featured a crossed-out delivery fee that is replaced with "$0 with GH+," conveying that the subscriber will not be charged anything beyond the cost of the food.

**Figure 10.**



69.     Grubhub continues to market the subscription plan at checkout, when a diner has finished selecting menu items and is close to placing the order. Grubhub shows the potential

savings on the particular order, displaying a large purple button encouraging diners to save money by enrolling in Grubhub+.

70.     Clicking the button reveals a pop-up window screen like the one shown below in Figure 11, which features "$0 delivery fees" and allows diners to subscribe with a single click. The consumer's payment information is pre-populated in the pop-up, and below that is a large yellow button labeled "Try 30 days free" that automatically enrolls consumers in Grubhub+ upon clicking. The pop-up features "$0 delivery fees" as the key feature of the subscription.

**Figure 11.**



71.     Many of the pop-up windows do not include any reference to other fees at all. Even those that do, however, like the example above, never tell consumers that Grubhub will charge a substantial fee on the vast majority of orders despite Grubhub's "free delivery"

promises. Nor do they reveal that Grubhub will charge a fee on all orders below a $12 threshold, so those orders are also not "free."

72.     Grubhub thus broadcasts a simple message: for $9.99 per month, Grubhub+ subscribers will receive unlimited free delivery. Using this strategy, Grubhub lures consumers into its auto-renew subscription plan to—in Grubhub's words—"lock them in" to its platform.

### iii.     Grubhub+ Subscribers Have Been Misled by Deceptive Promises of Free Delivery

73.     Consumers persuaded by the promise of free delivery subscribe to Grubhub+ and then are surprised to discover they are still charged for delivery in the form of other fees described above. In addition, some subscribers are unexpectedly charged a "delivery fee" at checkout, because they ordered from a restaurant that is not eligible for Grubhub+—a condition that Grubhub also conceals. A July 2020 Grubhub strategy document specifically highlighted restaurant selection as a top reason for Grubhub+ cancellations, with consumers reporting that "I didn't realize how few of the GH restaurants in my area were GH+," and "it should be stated that the free delivery is for a select amount of restaurants." By around August 2021, for example, only 60% of the restaurants on the platform participated in Grubhub+.

74.     As Grubhub knows, many subscribers believe its promises of free delivery. It has regularly received complaints from subscribers who had expected "free delivery" to mean that Grubhub would charge no fees whatsoever on delivery orders. And an August 2020 customer service analysis recognized that Grubhub+ subscribers remained unaware of what Grubhub described internally as the "restrictions of the free delivery benefit."

75.     Unless diners carefully scrutinize the checkout page or their receipts, they may never realize that their "free delivery" benefit is illusory. Many subscribers who eventually discover the hidden costs contact Grubhub's customer service to report the fees, which they believe to be in error. Frustrated diners report: "I keep getting charged service fees of 1-5 dollars

per order. Is this a mistake?"; "Why is there a service fee? I have Grubhub+"; "Why am I still paying a 'service fee' if I pay for grubhub+?"; "I thought as a grubhub+ member, there were no fees"; and "So grub hub just changed the name of the delivery fee? Why exactly am I paying for seamless plus then?"

76.     Grubhub designed its subscription program to bait consumers with claims of "free delivery" while making up for lost revenue by assessing undisclosed fees. Those fees help Grubhub "control the cost" of the subscription program and protect profitability. Grubhub's then-Senior Vice President of Growth admitted that this practice "[f]eels bad."

77.     Grubhub knows that its marketing tactics have misled subscribers about the benefits of Grubhub+, but it continues to falsely promise "free delivery."

**B.      Grubhub+ Enrollment Is Fast and Easy, While Cancellation Is Clunky and Difficult**

78.     Grubhub has designed the Grubhub+ enrollment process to be fast, convenient, and straightforward. The signup pages are everywhere—every page in the meal ordering flow includes promotional banners or advertisements from which consumers can enroll in Grubhub+ with a single click in a pop-up window; they need not even navigate away from the meal ordering or checkout page to do so.

79.     By contrast, Grubhub's cancellation process is more complex, clunky, and difficult than the easily accessible, one- or two-click Grubhub+ enrollment process. Cancellation requires the consumer to navigate to a designated page and complete a multi-page, multi-click process.

80.     A typical cancellation process proceeds as follows. First, the diner must click the "Grubhub+ membership" option on the "Account" page. That membership page, shown below, contains no option to cancel. Instead, it lists the various benefits of Grubhub+, through which the consumer must scroll to reach the "Manage membership" button at the bottom of the page.

Buried below this button, in hard-to-read text, is a statement that the consumer will be charged $9.99 plus tax on a certain date.

**Figure 12.**




81.     This inconspicuous statement is also the only place where Grubhub reports the subscription's billing date, which does not even mention the deadline to cancel and avoid the next month's charge. That makes it difficult for diners to take the very first step in canceling—determining the date by which to do it.

82.     Once diners have figured out when to cancel, have found the Account page, and have clicked the "Grubhub+ membership" option, they must click on the "Manage membership" button. That reveals the page shown below, which provides two options, one of which is "Cancel membership."

24

**Figure 13.**



83. But clicking "Cancel membership" here still does not terminate the membership. Instead, Grubhub presents the consumer with another screen, shown below, featuring a bulleted list of Grubhub+ subscription benefits and two more options: "Keep membership" and "Cancel membership."

**Figure 14.**



84. Clicking "Cancel membership" on this screen again does not actually terminate the subscription. Grubhub forces the diner through yet another screen, shown below, offering a $15 credit to stay subscribed. The button to "Stay and get $15" is highlighted in bright yellow, above a muted "Cancel membership" button. Only by clicking on this "Cancel membership" button can a consumer finally terminate the subscription. That means the consumer has to click a "cancel" button at least three times.

**Figure 15.**



85.     While the Grubhub+ enrollment process can be completed in one or two clicks from nearly anywhere in the diner's account or anytime during the ordering flow, Grubhub hides the cancellation option behind a multi-page, six-click flow that many consumers have difficulty locating.

86.     Grubhub has received numerous consumer complaints about the difficulty canceling Grubhub+ subscriptions, including reports that "I keep getting charged . . . I do not see an option to cancel on my end"; "I can't find where to discontinue . . .  I believe was charged last month as well but I still couldn't find where to do it"; and "Can you please help me cancel my membership to grubhub+[.] I can not find account settings. I can not find grubhub+ membership."

87.     Grubhub is aware that this complex cancellation process obstructs consumers'
attempts to terminate their subscriptions. Indeed, a company slide deck reporting customer
service complaints about Grubhub+ highlighted one subscriber who pleaded: "PLEASE cancel
this membership. I have been trying to cancel. No link found to cancel at ALL!" Despite this
awareness, Grubhub has not modified the cancellation process to address these issues.

## III.    Grubhub Locks Consumers' Gift Card Balances

88.     For years, Grubhub has employed a fraud detection system that has blocked
diners from completing orders and sequestered their gift card balances. While many companies
have fraud detection systems, in Grubhub's case, the company has frozen diner accounts
containing large gift card amounts without notifying those diners or restoring access to those
funds, even when consumers complain or verify that they are not fraudsters. This practice has
deprived many bona fide diners of their gift card balances, which have ranged from tens to
thousands of dollars—and has allowed Grubhub to pocket money received from the purchasers
of those gift cards, without giving consumers anything of value in exchange. Moreover, it has
left many diners—including Grubhub+ subscribers paying $9.99 per month—unable to use their
accounts to complete delivery orders.

### A.     Grubhub Blocks Diners' Accounts Without Notice or Explanation

89.     Grubhub sells gift cards on its own website and through third-party retailers.

90.     Often, people who receive Grubhub gift cards are experiencing significant, and
often difficult, life events. These individuals—who may be undergoing surgery or experiencing
an illness, childbirth, or the death of a loved one—often receive meal delivery gift cards from
family and friends to support them during this stressful time, when they may have no ability to
cook for themselves. These recipients may therefore load hundreds, and sometimes thousands of

dollars in gift cards onto a Grubhub account. Many of these consumers have never used Grubhub before, but they sign up for a new account just so they can use these gift cards.

91. To use gift cards, diners must "load" them into their accounts by adding the gift cards as a payment method. Diners can do that easily. When they attempt to pay for their orders using their gift cards, however, many find that Grubhub will not process their orders or will cancel orders after they are placed. Unbeknownst to them, Grubhub has blocked their accounts, because Grubhub often views the sudden loading of large gift card balances, or the use of gift cards by a new account holder, as suspicious.

92. Any fraud detection system will produce false positives, but bona fide consumers falsely flagged for fraud can generally verify their legitimacy when given the opportunity to do so. But Grubhub denies its customers that opportunity: it provides no notice to consumers, no way to unblock an account, and no way for bona fide gift card holders to get their money back from the company.

93. Diners may discover a problem with their accounts in two ways. They may complete an order with a gift card, but subsequently receive a cancellation email or see the cancellation in their order history. Alternatively, Grubhub may immediately reject the order as soon as it is placed, telling diners that "your order cannot be processed at this time," and that they should contact the restaurant directly—not Grubhub—to place an order. In addition to canceling or rejecting those original orders, Grubhub also blocks the diners' accounts, meaning that it rejects or automatically cancels all future orders.

94. At each step, Grubhub neither tells diners why they are unable to place an order, nor directs diners to contact Grubhub for further information.

95. Diners, for their part, do not understand what happened. Grubhub continues to allow them to access their accounts, which look the same: they can still log in, browse

29

restaurants, and add menu items to their bags as they usually would. But they can no longer complete any orders, and Grubhub does not explain why. Diners are left with unusable gift card balances, often worth hundreds or thousands of dollars, that are simply trapped in their accounts.

96.     Worse still, Grubhub does not warn blocked diners not to add more gift cards to their accounts or tell them these new funds will also be unusable. Sometimes consumers think the reason they cannot place an order is because there is a problem with their current gift cards or other payment methods, so they load even more gift cards onto their account while it is blocked. Grubhub allows this, knowing full well that the funds will be frozen.

97.     On top of that, diners spend significant time placing additional orders, sometimes from a different restaurant or with a different payment method, trying to avoid what they believe to be a technical glitch or payment error. One consumer who received a $500 gift card following surgery for a double mastectomy reported that she attempted to place six orders in a week, all of which were cancelled. She is far from alone: a Grubhub customer service document from 2021 reports that diners in this situation often try unsuccessfully to place multiple orders.

**B.      Grubhub Gives Consumers the Runaround**

98.     Frustrated consumers who cannot place orders or use their gift card balances often turn to Grubhub's customer service department for help. Many of these consumers are already dealing with stressful life events and are desperate to resolve the issue quickly.

99.     In one tragic example, a consumer received over $6,000 in Grubhub gift cards after her son passed away. After Grubhub rejected all of her orders and blocked her account, the grieving mother told customer service that her children would not be able to eat dinner that evening unless Grubhub resolved the problem, but the representative failed to do so. Two days later, the mother contacted customer service again, reporting that Grubhub had again rejected her gift card orders ten times. The agent responded that she was working to "improve the service"

and would send a report to the appropriate team. The consumer contacted Grubhub three times, during which the problem was not resolved.

100.    This consumer's experience is typical. Indeed, an April 2022 internal document acknowledges that, when a diner's account is blocked for suspicious behavior, Grubhub does not tell diners or even its own customer service agents "that future orders will no longer be accepted" from the diner's account—nor, indeed, does it provide *any* communication to the diner or *any* information to its customer service agents about the issue. The document also admits that this policy leads to customer dissatisfaction, increased complaint resolution time, and "repetitive contacts" by the consumer.

101.    Diners who press for more information are often told the account is temporarily on hold for their "protection," or that the issue will be "escalated" to Grubhub's fraud team, which will reach out to them in 24-48 hours. That, too, is a lie—Grubhub rarely gets back in touch. This cycle often repeats many times: diners contact customer service a second, third, or fourth time; Grubhub tells them there is no new information and does not allow them to speak to a supervisor or anyone else; and customer service agents repeat that someone will call back in 24-48 hours, but no one ever does.

102.    In the unusual instance where Grubhub does unblock an account, diners are often able to place just one order using a gift card before finding themselves blocked again. These diners are then forced back into the cycle of repeatedly contacting customer service and never hearing back. Some diners, frustrated and exhausted, give up before they can use the full value of their gift cards.

103.    Bona fide recipients of multiple or large gift cards unfortunately bear the brunt of Grubhub's endless customer service loop. One consumer whose family of six became ill with COVID-19 could use a $500 gift card only once before Grubhub blocked her account. Grubhub

promised that someone would reach out within 48 hours to help, but no one ever did. Because they could not get any food delivered for over seven days, they had to ask other people to bring them food. Yet another consumer, who was staying near a cancer center while her husband was receiving radiation treatment, could only use her $300 gift card once before she was blocked. Grubhub purported to "escalate" her issue and repeated the same empty promises of hearing back within 48 hours. The consumer reported that the experience was "extremely extremely frustrating in an already vulnerable situation." Similar sad stories abound.

### C. Stressed Consumers Lose Money and Time

104.    Diners with blocked accounts often lose their gift card balances, which are frequently worth hundreds or thousands of dollars. An internal customer service document showed that, in 2021, more than 97% of blocked diners during one particular month were never unblocked, meaning that those diners were permanently denied the use of their gift cards. In such cases, Grubhub provides no benefit to the owners of those gift cards, but nevertheless keeps the money that friends or family originally paid to purchase the cards. Grubhub therefore has little financial incentive to fix the problem.

105.    Grubhub routinely refuses to refund diners for blocked gift card funds or allow diners to transfer the gift cards to use in a different, unblocked account. Indeed, Grubhub explicitly prohibits customer service agents from "unlinking" a loaded gift card in a blocked account (or any other account) under any circumstances, or from asking supervisors to do so. And, as mentioned earlier, Grubhub permits blocked account holders to add additional gift cards without warning them the money will be lost.

106.    On top of appropriating their gift card funds, Grubhub also prevents blocked account holders from accessing other benefits. For example, diners who are paying for a Grubhub+ subscription continue to be charged for the service, despite their inability to place any

orders while their account is blocked. Similarly, Grubhub continues to run the clock on Grubhub+ free trial memberships while an account is blocked. Diners also lose out on expiring credits, like promotions and meal credits, while their accounts are blocked. The result is that consumers with blocked accounts must continue to pay for services Grubhub prohibits them from using. In addition, consumers waste time and energy, and suffer significant stress dealing with their accounts, commonly without success, and often on top of already taxing life circumstances.

107.    Since at least 2019, Grubhub has received numerous complaints about consumers' inability to use their gift card balances and other benefits, but it has not fixed these issues. A 2021 Grubhub document highlights blocked accounts and unusable gift cards as the category with the most complaints to the Better Business Bureau. Similarly, blocked accounts remain one of the largest internal complaint categories. In June 2022 alone, nearly 7,000 diners reported suffering from blocked accounts, resulting in more than 11,000 customer service contacts.

108.    Because Grubhub has not taken steps to address the issue, diners continue to complain about Grubhub's "unilateral restriction and lack of notification" about blocked accounts, and its "effective theft of funds." Consumers cannot reasonably avoid these harms because Grubhub does not tell them that they have been blocked; *why* they have been blocked; or what, if anything, they can do to restore their accounts and access their gift card funds again. These harms to consumers outweigh any purported benefit.

## IV.    Grubhub Falsely Represents an Affiliation with Restaurants Without Their Permission, Damaging Their Revenues and Reputation

109.    Grubhub places on its platform Unaffiliated Restaurants that have not given Grubhub permission to be listed and that have not allowed Grubhub to take diners' orders and deliver food on their behalf. In most cases, the restaurants do not even know Grubhub has added

them to its offerings. Similarly, Grubhub does not tell diners which restaurants on its platform are unaffiliated.

110.    By falsely representing an affiliation with these restaurants, Grubhub boosts its own offerings, expands its scale, and fuels its business—but at significant cost to the restaurants that have not consented to a partnership with Grubhub.

111.    In particular, Grubhub's practices harm the Unaffiliated Restaurants by diverting business away from the restaurants' own delivery services. The restaurants' reputations also suffer, because the lack of an affiliation between Grubhub and the restaurant often results in a bad experience for diners, such as inaccurate orders and slow deliveries. Although these problems are entirely Grubhub's fault, the diners end up blaming the Unaffiliated Restaurants, which ultimately lose business. When thousands of restaurants complained to Grubhub and demanded to be removed from the platform, Grubhub attempted to coerce them into signing a paid contract instead.

112.    In addition, distinct features of platform markets incentivize platforms to rapidly increase scale. Digital platforms, like Grubhub, that enable interactions between distinct users on the platform benefit from network effects. An increased number of restaurant listings increases the appeal of platform to customers, and an increased number of customers increases the appeal of the platform to restaurants. Such network effects can confer a powerful incumbency advantage on a platform that can get to scale quickly, creating barriers to entry and competition.

113.    These features of digital markets can mean that firms that achieve the necessary scale to take off can experience accelerated growth. This type of accelerated growth, whether achieved through fair or unfair methods of competition, can create a formidable advantage, effectively blocking off the market to competition.

A.      **Grubhub Adds Restaurants Without Their Knowledge or Consent to Artificially Boost Supply**

114.    In the food-delivery business, companies are incentivized to increase the number of restaurants on their platforms to draw more diners. Diners will often decide which delivery service to use based on the number of available options. A larger restaurant supply ensures that a diner's particular choice—her favorite diner, the Thai restaurant she feels like ordering from that evening, the pizza place her kids request on Friday night—is available. Boosting the number of offerings is thus critical to attracting diners and growing market share.

115.    In early 2019, Grubhub executives directed the addition of Unaffiliated Restaurants, considering them a critical part of the company's business strategy. A former executive sent other members of the management team and employees a whiteboard drawing of things "that I really really really really want," telling them that "I will bug you every Friday to email your progress and milestones" on these projects. One of those included the "expansion" of Unaffiliated Restaurant delivery.

116.    Under that directive, Grubhub's Unaffiliated Restaurants grew to more than 325,000 at its peak, and accounted for between 20% and 53% of Grubhub's total restaurant listings from 2019 to 2022. Grubhub determined that Unaffiliated Restaurants led to "massive growth everywhere" and was a successful "mechanism to gain national scale." In Chicago, for instance, Grubhub reported that it had "added substantially all [Unaffiliated Restaurant] inventory currently available" by 2020, becoming "the #1 delivery provider in Chicago" in terms of restaurant supply.

117.    Similarly, by early 2020, Grubhub's restaurant supply surpassed DoorDash's—a major competitor—as a result of its rapid addition of Unaffiliated Restaurants. By that time, too, the number of Unaffiliated Restaurants exceeded the number of contracted restaurants on Grubhub's platform.

118.    Grubhub executives boasted about these results in a February 2020 shareholder letter. They told investors that Grubhub more than doubled its restaurant inventory in only three months by the "rapid addition" of 150,000 Unaffiliated Restaurants.

**B.    Grubhub's Chaotic Ordering Process Harms Unaffiliated Restaurants**

119.    Grubhub's addition of Unaffiliated Restaurants led to a dramatic increase in its restaurant supply, but it also caused considerable harm to the affected restaurants.

120.    First, diners place orders through the Grubhub platform when they otherwise may have ordered directly from the restaurant itself—diverting business away from the restaurant's own delivery business and own delivery drivers. In fact, Grubhub's Unaffiliated Restaurant listings typically show up as advertisements at the top of the Google search page, above the restaurant's own listing. As a result, diners searching for the restaurant are first directed to a link to order delivery through Grubhub—not through the restaurant itself.

121.    On top of that, Grubhub's fulfillment process for Unaffiliated Restaurants causes numerous problems that ultimately affect the restaurants' bottom line. For a contracted restaurant, a diner will place an order and make the payment on Grubhub's desktop or mobile site; that order will automatically be sent to the restaurant to fulfill, and to the driver to deliver.

122.    By contrast, because Unaffiliated Restaurants do not have ordering systems that are integrated with Grubhub, the ordering process is more difficult and time consuming. For those orders, Grubhub sends the diner's order to the delivery driver, who then must separately, and manually, place the real order—either by calling the restaurant or placing an order on the restaurant's website.

123.    Once at the restaurant, the driver must pay using a Grubhub card. Sometimes, the Grubhub cards have insufficient funds or are otherwise declined; other times, the driver discovers that the restaurant is cash only. Drivers are not allowed to use a different payment

method, because Grubhub will not reimburse them later. When problems like these arise, Grubhub provides no real-time troubleshooting to help drivers deal with payment problems, as it does when drivers experience issues with orders from affiliated restaurants.

124.    In these instances, the Unaffiliated Restaurant, which has already prepared the food, does not get paid. The restaurant must either let the food go to waste, or turn the food over without receiving payment to prevent complaints from disgruntled diners.

125.    Indeed, Unaffiliated Restaurants often lose business because consumers are unhappy with their experience ordering through Grubhub. Because Grubhub does not have relationships with the restaurants, it must cobble together restaurant information—such as hours of operation, addresses, menu items, menu prices, and delivery times—from third-party sources. Grubhub does not manually validate this information for accuracy.

126.    These inaccuracies often create serious problems. A driver who calls an Unaffiliated Restaurant to place a diner's order may discover it is actually closed, or the ordered items are unavailable, or the listed prices are incorrect. In many instances, Grubhub may not inform diners of these problems or help diners resolve them, simply canceling the diner's order instead.

127.    Orders from Unaffiliated Restaurants also take longer to place and deliver because of the roundabout ordering process described above. And because Grubhub's listed delivery times are often incorrect, they set unrealistic expectations and increase customer complaints.

128.    Grubhub's diner-facing platform does not distinguish between affiliated and Unaffiliated Restaurants, so frustrated diners do not know that Unaffiliated Restaurants did not consent to being on Grubhub. As a result, they attribute their bad experiences to the restaurants, rather than Grubhub. They complain to the restaurants and leave negative reviews on Google,

Yelp, and other websites, damaging the restaurants' reputations. Ultimately, they stop ordering from the Unaffiliated Restaurants.

129. Grubhub also charges larger diner fees for orders from Unaffiliated Restaurants, to compensate for the higher costs of fulfilling these orders and because it earns no commissions from Unaffiliated Restaurants. In early 2020, for example, diners paid an average of $3.87 to $5.56 in fees for an order from a partner restaurant, compared to $10.99 from an Unaffiliated Restaurant. Diners thus pay more for their meal than if they had ordered from the Unaffiliated Restaurant directly, from a competitor food-delivery platform with which the Unaffiliated Restaurant has actually contracted, or from a different restaurant with which Grubhub had contracted.

130. Grubhub's Unaffiliated Restaurant practices negatively affect other parties, too. Orders from these restaurants require more effort from drivers, who must manually place the diner's order and make the payment. Drivers also have to deal with frustrated diners when the order is wrong or delayed. Grubhub's partner restaurants also lose business to Unaffiliated Restaurants, which are listed on the same platform but are not paying Grubhub commissions.

### C.  When Unaffiliated Restaurants Request Removal, Grubhub Pressures Them To Sign Contracts Instead

131. Unaffiliated Restaurants complain to Grubhub when they discover the company has listed them without their consent. To be removed, they must go through a difficult, lengthy, and opaque process, and often succeed only with incessant follow up.

132. Grubhub not only jeopardizes the reputations and threatens the businesses of Unaffiliated Restaurants, but also attempts to coerce Unaffiliated Restaurants to enter into paid contracts. When an Unaffiliated Restaurant contacts Grubhub about removal, customer service agents are required to transfer the call to the sales team, which warns that the restaurant could lose any business it has gained on the platform. As stated in a marketing plan, Grubhub's goal is

38

"to get [Unaffiliated Restaurants] hooked on the incremental online business, and then negotiate with them to sign a traditional contract." In fact, Grubhub may even give Unaffiliated Restaurants an artificial boost—in the form of higher rankings and greater visibility—to drive up demand and help make the sale.

133.    Other times, Grubhub simply ignores an Unaffiliated Restaurant's removal requests. Restaurants complain to Grubhub for months, or years, before Grubhub takes any action. In one case, a restaurant requested removal for over three years, to no avail. The restaurant finally complained directly to a Grubhub executive that the company was destroying the integrity of its food and reputation, because Grubhub's drivers did not have the proper containers to transport its food, could not answer diners' questions, and made delayed deliveries of lukewarm and soggy food. In an effort to stop the Grubhub orders, this restaurant even blocked its systems from accepting Grubhub credit cards. Unfortunately, this restaurant's experience is all too common.

134.    Grubhub often does not remove Unaffiliated Restaurants until there is serious pressure to do so, such as when the restaurants threaten legal action. Thousands of Unaffiliated Restaurants have sent cease-and-desist letters to Grubhub, complaining that they have repeatedly requested removal without success.

135.    In other instances, restaurants have turned to the press. In one case, a reporter informed Grubhub that the local news station would be airing a story about Grubhub's unauthorized orders. As Grubhub scrambled to remove the listings before the story aired, its employees acknowledged internally that Grubhub had never responded when one of the restaurants had emailed to be removed.

136.    In another case, Grubhub reached out to some Unaffiliated Restaurants only after it learned that the *New York Post* would be running a similar story. Grubhub admitted that the

goal of this outreach was to be able to tell the *Post* that it was actively responding to the restaurants' requests.

137.     In yet another example, a reporter from *Eater* told Grubhub that he was doing a story about how the company was "impersonating a restaurant." Grubhub removed the restaurant in three hours, noting that "this situation risks spiraling badly" and that the restaurant owner has "a good argument to make."

138.     Grubhub thus calibrates its removal process to have the right amount of "friction" so that it can keep the Unaffiliated Restaurants—either by ignoring their removal requests or converting them to partner restaurants. As a Grubhub employee summed up: "Not good necessarily but the company goal was supply."

**D.     Grubhub Has Continued Its Unaffiliated Restaurant Practices Despite Repeated Complaints**

139.     As top executives have acknowledged, Grubhub's Unaffiliated Restaurant practices are bad for consumers, but they are an easy way to grow the business. And Grubhub does not even try to keep the problems a secret. In the fall of 2019—around the time Grubhub first began adding Unaffiliated Restaurants—executives already knew these practices were troublesome, freely admitting in a shareholder letter that "we believe [Unaffiliated Restaurant] options are the wrong long-term answer for diners, restaurants, and shareholders." The practices, they acknowledge, create a "suboptimal" experience. Yet Grubhub would continue apace, the letter explained, because Unaffiliated Restaurants were an "extremely efficient and cheap" way to boost restaurant inventory, and would help Grubhub quickly double its restaurant supply—and fuel its growth.

140.     Internally, a former executive also acknowledged continuing concerns about the "poor" quality of service for Unaffiliated Restaurants, noting that "[w]e are literally doubling the restaurant inventory diners see with almost no planning/analysis." He asked his team: "Should

we be warning [diners] the experience will be different? More expensive? Longer ETA because they are 'different'? Right now, I am pretty sure people don't see the massive fees until checkout."

141. Employee grievances about Unaffiliated Restaurants also multiplied. In one document, an employee warned that practices around Unaffiliated Restaurants "are terrible because [restaurants] have zero control over their brand or user experience. I don't think this option should be something we offer to restaurants, ever."

142. Grubhub also audits its Unaffiliated Restaurants to track the causes of customer complaints and order cancellations. The audits revealed that Unaffiliated Restaurants often refuse to fulfill an order when they learn that it is coming from Grubhub. The restaurants do not want to work with Grubhub, or they suspect a scam.

143. Rather than fix these problems, Grubhub instead took steps to make its practices difficult for diners and restaurants to detect. Grubhub still does not disclose to diners when they are ordering from an Unaffiliated Restaurant or warn that those orders may be subject to higher fees, delays, or order problems.

144. Grubhub also goes to great lengths to hide its involvement from Unaffiliated Restaurants. It directs drivers to place orders under the diner's name and then to impersonate the diner at the restaurant. A former executive also discussed with employees other strategies to remain undetected, such as telling drivers to leave their Grubhub thermal bags outside during pickups from Unaffiliated Restaurants.

145. Grubhub also conceals its tactics when adding Unaffiliated Restaurants to its online listings. It tries to "be as close to unnoticed as possible until the volume gets super material," when Grubhub can use that order volume to pressure restaurants to partner with the company.

146. Similarly, Grubhub avoids adding Unaffiliated Restaurants that might resist or vocalize their concerns. In one instance, an employee advised not to add Texas Roadhouse, which had previously sent Grubhub a cease-and-desist letter. The employee also asked whether Long John Silver's, Ruth's Chris, and Dairy Queen had "cooled off" long enough to be added back on the platform. And another employee concluded that Grubhub should be fine adding a few other chains with whom Grubhub has had "no active discussions."

147. Despite these well-documented harms, Grubhub continues listing Unaffiliated Restaurants without their knowledge and consent and has indicated no plans to stop the practice. Restaurants cannot reasonably avoid these harms because Grubhub adds them in secret and does not comply when the restaurants ask to be removed. These harms to consumers and competition outweigh any countervailing benefits, which Grubhub has conceded are nearly nonexistent. Indeed, the only benefit is to Grubhub, which can add restaurant supply quickly and cheaply.

## V. Grubhub Has Misled Drivers About How Much They Will Earn

148. Grubhub requires hundreds of thousands of drivers to carry out its delivery services. As another part of the company's underhanded growth strategy, Grubhub has lured people into signing up by promising they can earn enticing hourly rates, like $26 per hour, while working flexible hours and part-time schedules. In reality, however, drivers earn far less. In 2023, only approximately the top 2% of Grubhub drivers typically earned the advertised amount, and the median earnings were only about $11 per hour.

### A. Overview of Grubhub's Gig System

149. Grubhub relies on gig workers to meet the demands of its millions of diners, enlisting over 200,000 delivery drivers across the country at any given time.

150. Grubhub treats its gig workers as independent contractors who are not entitled to the benefits enjoyed by traditional employees, such as salaries, benefits, regular work schedules,

or the protection of employment and labor laws. Drivers must also supply their own cars, insurance, and gas at their own expense. This arrangement saves Grubhub significant labor costs by allowing it to quickly add or shed drivers to meet customer demand and to avoid paying drivers for any time they are not actively on a delivery route. Grubhub actively targets people who may be attracted to non-traditional or seasonal work schedules, such as college students and small business owners.

151.    When Grubhub drivers work a shift, they log into Grubhub's mobile application and toggle themselves "on," which indicates they are available to accept deliveries.

152.    Once a driver has toggled "on," the Grubhub application may send them an offer for a delivery accompanied by the total payment for completing it. The driver can then decide to accept or decline that offer. It is difficult to predict exactly when or how many offers will come in; drivers can wait for hours without receiving a single offer, or they can get a string of offers with little or no waiting time in between. When they are done driving, they toggle "off."

153.    Drivers can work on an ad hoc basis by toggling "on" and "off" whenever they want. Or they can sign up in advance for scheduled "blocks" for set periods of time (for example, 12-2 p.m. on Friday), and then log in during those specified blocks.

154.    Grubhub generally pays its drivers on a per-delivery basis. Broadly speaking, the total delivery pay consists of three main components (in addition to some optional, ad hoc components): mileage, time spent on the road, and tips.

155.    The mileage accounts for the total distance driving to the restaurant to pick up the order and then to the diner to drop off the order. The time accounts for how long it takes to drive to the restaurant, wait for the order, and then drive to the diner. The mileage and time components are based on estimates Grubhub makes at the time it sends the offer to the driver. If

the actual mileage and time end up being higher than the estimate, the driver is generally not compensated for the extra work.

156.    Tips, the third component, are paid by the diner. Most drivers report that tips make up 40-60% of their pay. That means that diners—not Grubhub—pay nearly half or more of a driver's earnings.

**B.    Grubhub Has Made Unsubstantiated Earnings Claims**

157.    To entice people to sign up as Grubhub drivers, Grubhub has disseminated advertisements that falsely promise consumers will earn a certain hourly rate, which varies depending on the location. The advertised hourly rate is high—often more than double the jurisdiction's minimum wage. For instance, in January 2023, Grubhub touted on Facebook that workers can "Earn up to $40 per hour as a Grubhub delivery driver in New York City!"

**Figure 16.**



158.    Similarly, in August 2022, it advertised on Facebook and Instagram: "Want to earn up to $26/hr delivering food around Denver?"

**Figure 17.**



159.    And in April 2023, it advertised on Google: "Up to $26 Hourly – Earn Money in

Chicago."

**Figure 18.**



160.     Grubhub's advertisements provide no clarification or qualification of the hourly earnings claim.

161.     Grubhub has placed these advertisements on search engines like Google and Bing; social media sites like Facebook, Instagram, TikTok, and Snapchat; and job boards like Craigslist. The company has spent hundreds of thousands of dollars on these advertisements, which have generated significant clicks and impressions. Since at least 2019, Grubhub regularly ran these hourly earnings advertisements in thousands of markets across the United States.

162.     The represented hourly earnings in these advertisements are material to a consumer's decision to become a Grubhub delivery driver. Nearly half of Grubhub's drivers rely on the company as their full-time income source. Internal Grubhub analyses reiterate that "earning potential is repeatedly identified as the fundamental concern drivers have with Grubhub," over other purported benefits such as flexibility. Similarly, company studies confirm that the "most motivating" reason for becoming a driver is the ability to make money.

163.     Grubhub's inflated hourly earnings advertisements attracted a surge of drivers: when the advertisements started running in 2019, they led to a 398% increase in driver leads and a 278% jump in the rate at which drivers click on the advertisement, reducing Grubhub's marketing costs by 79% per lead.

164.     Grubhub's hourly earnings claims in these advertisements, however, are false or unsubstantiated. According to Grubhub's own data, the actual earnings for Grubhub drivers fall well below the advertised hourly rate. With respect to the January 2023 advertisement about earning "up to $40 per hour" in New York City, for example, the median earnings of a Grubhub driver in New York City at that time were only $10 per hour. In addition, only 0.1% of New York City drivers made the claimed $40 per hour during that time period.

165.     Similarly, when Grubhub advertised in April 2023 that Chicago drivers could earn "Up to $26 Hourly," that was not true, either. The median earnings of a Chicago driver were only $11 per hour, and only 1.3% of drivers earned the promised $26 per hour.

166.     Similar claims that Grubhub has made in other parts of the country also are unsubstantiated. The chart below shows a sample of the advertised hourly earnings in some of Grubhub's core markets, compared to the actual median earnings:

**Table 1.**

| Date of Advertisement | Location | Advertised Hourly Earnings | Median Actual Hourly Earnings | Percent of Drivers Earning Advertised Amount |
|---|---|---|---|---|
| January - August 2022 | Baltimore | $25 | $14 | 2.2% |
| January - August 2022 | Boston | $26 | $18 | 5.4% |
| January - August 2022 | Chicago | $26 | $15 | 1.9% |
| January - August 2022 | Denver | $26 | $17 | 3.7% |
| January - August 2022 | New York City | $26 | $12 | 1.3% |
| January - August 2022 | Philadelphia | $24 | $13 | 3.6% |
| January - August 2022 | Portland | $24 | $18 | 7.3% |
| August 2022 | Baltimore | $25 | $13 | 2.1% |
| August 2022 | Boston | $26 | $17 | 5.9% |
| August 2022 | Chicago | $25 | $13 | 1.7% |
| August 2022 | Denver | $26 | $17 | 2.3% |
| August 2022 | New York City | $26 | $10 | 1.5% |
| August 2022 | Philadelphia | $24 | $12 | 4.4% |
| August 2022 | Portland | $24 | $17 | 8.6% |
| January 2023 | New York City | $40 | $10 | 0.1% |
| February 2023 | Boston | $26 | $13 | 3.5% |
| February 2023 | Denver | $26 | $14 | 2.3% |
| February 2023 | National | $26 | $11 | 1.9% |
| February 2023 | New York City | $26 | $10 | 1.5% |
| April 2023 | Chicago | $26 | $11 | 1.3% |

167.     This table shows that only around the top 2% of drivers earn Grubhub's advertised hourly rate. At best, that figure is about 9% in these examples. Because Grubhub

closely tracks the amounts it pays drivers, it knows that most drivers make substantially less than the advertised amounts. Despite knowing from its own data that the vast majority of delivery drivers were not making anywhere near the claimed hourly rates, Grubhub continued to run advertisements with unsubstantiated hourly earnings claims.

168.    Due to the disconnect between Grubhub's representations and drivers' actual earnings, drivers quickly leave Grubhub. Internal analyses show that Grubhub loses 50% of its driver population every 7-8 months. This high driver churn rate places even greater pressure on Grubhub's marketing efforts to recruit new drivers.

### C.    FTC Sends Grubhub Notice of Penalty Offenses

169.    In October 2021, the FTC sent Grubhub a letter that included a copy of the Notice of Penalty Offenses Concerning Money-Making Opportunities. Grubhub received this letter on October 27, 2021. The letter and Notice of Penalty Offenses identified specific acts or practices that the Commission has determined are unfair or deceptive and violate Section 5 of the FTC Act, 15 U.S.C. § 45.

170.    As detailed in the Notice enclosed with the letter, the Commission determined in a series of litigated decisions that, among other things, it is an unfair or deceptive trade practice to make false, misleading, or deceptive representations concerning the profits or earnings that may be anticipated by a participant in a money-making opportunity (i.e., a person who has been accepted or hired for, has purchased, or otherwise is engaging in the money-making opportunity).

171.    The Notice cited a series of litigated decisions that determined, among other things, that it is an unfair or deceptive trade practice to make false, misleading, or deceptive representations concerning the profits or earnings that may be anticipated by a participant in a money-making opportunity. The Notice warned Grubhub of its potential liability for civil

penalties under Section 5(m)(1)(B) of the FTC Act, for knowingly engaging in acts or practices determined by the Commission to be unfair or deceptive, and thus unlawful.

172.    The letter instructed Grubhub to contact Commission staff if it had any questions or to visit the Commission's website at www.ftc.gov/MMO-notice to obtain copies of the case decisions discussed in the Notice.

173.    Despite receiving the Notice of Penalty Offenses, Grubhub continued to make misleading earnings claims in marketing its money-making opportunity.

*        *        *

174.    Based on the facts and violations of law alleged in this Complaint, Plaintiff FTC has reason to believe that Defendants are violating the following laws enforced by the Commission:

## VIOLATIONS OF THE FTC ACT

175.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce" and "unfair methods of competition."

176.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

177.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that are not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

178.    Conduct is an unfair method of competition under Section 5 of the FTC Act if it is undertaken by an actor in the marketplace and goes beyond competition on the merits. Deceptive conduct that negatively affects competitive conditions goes beyond competition on the merits.

**Count I (by Plaintiff FTC)**
**Deceptive Claims Regarding Price for Grubhub's Services**

179.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of food ordering and delivery services, Defendants represent, directly or indirectly, expressly or by implication, that:

      a.   Grubhub customers will pay a specific amount for Grubhub's delivery services; or

      b.   Grubhub+ subscribers will receive free delivery.

180.    In numerous instances, Defendants' representations as set forth above are false or misleading.

181.    Therefore, Defendants' representations constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II (by Plaintiff FTC)**
**Unfair Account Blocks**

182.    In numerous instances, Defendants deny consumers use of their accounts and funds, including by doing so without notifying consumers or providing recourse to restore such use.

183.    Defendants' acts or practices set forth above have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that are not outweighed by countervailing benefits to consumers or competition.

184.    Therefore, Defendants' acts or practices constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**Count III (by Plaintiff FTC)**
**Unfair Listing of Restaurants Without Consent**

185.    In numerous instances, Defendants have created listings for restaurants without the restaurants' express informed consent and have deficiently processed diners' orders from those restaurants.

186.    Defendants' actions set forth above have caused or are likely to cause substantial injury to these restaurants that the restaurants cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to the restaurants or competition.

187.    Therefore, Defendants' acts or practices constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**Count IV (by Plaintiff FTC)**
**Unfair Methods of Competition**

188.    Grubhub competes in the market for prepared meal delivery both with independent restaurants that offer delivery services and with other third-party food delivery platforms that process and/or deliver prepared meals to customers.

189.    In numerous instances, Grubhub has created listings for restaurants without the restaurants' express informed consent and has deficiently processed diners' orders from those restaurants. Grubhub pursued this deceptive tactic explicitly in order to boost growth and achieve greater scale. Grubhub's creation of listings for unaffiliated restaurants and processing of diners' orders from those restaurants is deceptive because Grubhub represents to diners that the restaurants are affiliated with Grubhub when they are not. Grubhub has also gone out of its way to conceal its tactics from restaurants, even as its practice of listing unaffiliated restaurants harms the revenues and reputations of those restaurants. When asked to remove such listings, Grubhub has ignored the request or sought to leverage the request to coerce the restaurant into signing up for a partnership with Grubhub.

190.     Grubhub represents to diners, directly or indirectly, expressly or by implication, including by creating listings for Unaffiliated Restaurants and processing diners' orders from those restaurants, that Grubhub maintains an affiliation with those Unaffiliated Restaurants. In fact, however, in numerous instances in which Grubhub makes the representations set forth above, Grubhub has no affiliation with those Unaffiliated Restaurants. These representations are material to diners.

191.     Grubhub also deceives meal delivery customers about its fees, to induce them to sign up for and use its service. This conduct constitutes methods of competition in the market for prepared meal delivery. These practices are not conditions of the marketplace, but tactics used by Grubhub to gain scale rapidly and to gain advantage over other third-party meal delivery platforms and independent restaurants that offer meal delivery.

192.     These practices are deceptive and coercive and tend to negatively affect competitive conditions in the meal delivery market, with respect to both independent restaurants that offer delivery services and other third-party food delivery platforms that process and/or deliver prepared meals to diners. This deceptive and coercive conduct tends to negatively affect competitive conditions because it enables Grubhub to gain customers, divert sales from rivals, grow its operations, and gain an unfair advantage over competing delivery services. Moreover, this deceptive and coercive conduct and the advantages gained by those engaged in such conduct punish honest competitors, making it infeasible for companies not engaged in similarly deceptive and coercive conduct to effectively compete in the prepared meal delivery market. Thus, the practices go beyond competition on the merits, are unfair, and degrade the quality of competition in that market. Grubhub's strategy of using deceptive and coercive tactics to boost its growth and scale constitute an unfair method of competition.

193.     Therefore, Grubhub's conduct set forth above constitutes an unfair method of

competition in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## Count V (by Plaintiff FTC)
### False or Unsubstantiated Driver Earnings Claims

194.    In numerous instances in connection with the advertising, marketing, or promotion of Defendants' food delivery driver program, Defendants have represented, directly or indirectly, expressly or by implication, that drivers are likely to earn a set hourly rate, such as $26 per hour.

195.    The representations set forth above are false or misleading or were not substantiated at the time the representations were made.

196.    Therefore, the making of the representations constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

197.    In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-05, which became effective on December 29, 2010. Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." 15 U.S.C. § 8401.

198.    Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310(w), unless the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides simple mechanisms to stop recurring charges. *See* 15 U.S.C. § 8403.

199. The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

200. The auto-renewal provision of Defendants' Grubhub+ subscription or membership program is a negative option feature as defined by the TSR, 16 C.F.R. § 310.2(w).

201. Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404(a), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA shall be treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and therefore a violation of ROSCA constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

202. For each violation of ROSCA, Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes the Court to grant relief as it finds necessary to redress injury to consumers, including monetary relief, rescission or reformation of contracts, the refund of money or return of property, and public notification respecting the rule violation or the unfair or deceptive act or practice.

**Count VI (by Plaintiff FTC)**
**Violation of ROSCA: Inadequate Disclosure**

203. In numerous instances in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, including Grubhub+, Defendants have failed to clearly and conspicuously disclose, before obtaining the consumer's billing information, all material terms of the transaction, including all fees applicable to Grubhub+ orders.

204. Defendants' practices as set forth above are violations of Section 4 of ROSCA, 15 U.S.C. § 8403(1), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count VII (by Plaintiff FTC)**
**Violation of ROSCA: Failure to Provide Simple Cancellation Mechanism**

205.     In numerous instances in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, including Grubhub+, Defendants failed to provide a simple mechanism for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

206.     Defendants' practices as set forth above are violations of Section 4 of ROSCA, 15 U.S.C. § 8403(3), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE IMPERSONATION RULE

207.     Under the Impersonation Rule, 16 C.F.R. pt. 461, it is a violation to "materially and falsely pose as" a government entity or a business, as well as to "materially misrepresent" an "affiliation with, including endorsement or sponsorship by" a government entity or a business.

208.     Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Impersonation Rule constitutes an unfair or deceptive act or practice under Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).

209.     For each violation of the Impersonation Rule, Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes the Court to grant relief as it finds necessary to redress injury to consumers, including monetary relief, rescission or reformation of contracts, the refund of money or return of property, and public notification respecting the rule violation or the unfair or deceptive act or practice.

**Count VIII (by Plaintiff FTC)**
**Violations of the Impersonation Rule**

210.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of food ordering and delivery services, including by creating listings for Unaffiliated Restaurants and processing diners' orders from those restaurants, Defendants represent to diners, directly or indirectly, expressly or by implication, that Grubhub maintains an affiliation with those Unaffiliated Restaurants.

211.    In fact, in numerous instances in which Defendants make the representations set forth above, Defendants have no affiliation with those Unaffiliated Restaurants.

212.    Therefore, Defendants' acts or practices are violations of the Impersonation Rule, 16 C.F.R. pt. 461, and therefore also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF PRIOR COMMISSION DETERMINATIONS CONCERNING**
**UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN COMMERCE**

213.    Pursuant to Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), if the Commission has determined in a proceeding under section 5(b) of the FTC Act, 15 U.S.C. § 45(b), that an act or practice is unfair or deceptive and issued a final cease and desist order with respect to the act or practice, then a person, partnership, or corporation that engages in such act or practice with actual knowledge that such act or practice is unfair or deceptive and is unlawful under Section 5(a)(1) of the FTC Act shall be liable under the FTC Act for such relief as may be appropriate.

214.    In prior litigated decisions, the Commission has determined that false, misleading, or deceptive representations concerning earnings in a money-making opportunity—like Grubhub's false earnings claims about delivery workers—are unfair or deceptive and violate

Section 5(a)(1) of the FTC Act and issued final cease and desist orders with respect to those acts or practices.

**Count IX (by Plaintiff FTC)**
**Violations of Prior Commission Determinations Known to Defendants**

215.    At least since receiving the Notice of Penalty Offenses Concerning Money-Making Opportunities and associated cover letter on October 26, 2021, Defendants have had actual knowledge that, in connection with the advertising or promotion of money-making opportunities, making false, misleading, or deceptive earnings claims is an unfair or deceptive act or practice, unlawful under Section 5(a)(1) of the FTC Act.

216.    In numerous instances since receiving the letter and Notice, Defendants represented, directly or indirectly, expressly or by implication, that drivers in Defendants' food delivery program are likely to earn a set hourly rate, such as $26 per hour.

217.    In fact, the representations set forth above are false or misleading or were not substantiated at the time the representations were made.

218.    Since at least October 26, 2021, Defendants have engaged in these acts and practices with the actual knowledge that, in prior litigated decisions, the Commission has determined that these acts or practices are unfair or deceptive and violate Section 5(a)(1) of the FTC Act and issued final cease and desist orders, other than consent orders, with respect to those acts or practices.

*        *        *

219.    Based on the facts and violations of law alleged in this Complaint, Plaintiff People of the State of Illinois has reason to believe that Defendants are violating the following laws enforced by the Illinois Attorney General:

## VIOLATIONS OF ILLINOIS STATE LAW

### The Illinois Consumer Fraud Act

220. Section 2 of the Consumer Fraud and Deceptive Business Practices Act

("Consumer Fraud Act") provides the following:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August, 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2

221. Section 7 of the Consumer Fraud Act provides:

> (a)    Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including by not limited to: injunction, revocation, forfeiture or suspension of any license, charger, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver, dissolution of domestic corporations or association suspension or termination of the right of foreign corporation or associations to do business in this State; and restitution.

> (b)    In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act. In the event the court finds the method, act or practice to have been entered into with the intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

> (c)    In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared

unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

815 ILCS 505/7.

222. Section 10 of the Consumer Fraud Act provides, "In any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State." 815 ILCS 505/10.

## <u>Illinois Uniform Deceptive Trade Practices Act</u>

223. Section 2 of the Illinois Uniform Deceptive Trade Practices Act provides, in relevant part, the following:

> A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:
>
> * * *
>
> (2) causes likelihood of confusion or of misunderstanding as the source sponsorship, approval, or certification of good or services;
>
> (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;
>
> * * *
>
> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;
>
> * * *
>
> (11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;
>
> (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS 510/2(a)

> (b) In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.

815 ILCS 510/2(b).

### Count X (by Plaintiff State of Illinois)
**Violations of the Illinois Consumer Fraud Act**

224.     The Illinois Attorney General re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs.

225.     Defendants, in the course of trade or commerce, have in numerous instances engaged in conduct which constitutes unfair and deceptive acts or practices declared unlawful under section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by:

      A.     Misrepresenting directly or indirectly, expressly or by implication, through advertisements, marketing, and offers for the sale of food delivery services, that Illinois consumers would pay a set delivery fee in connection with a Grubhub food delivery order;

      B.     Failing to disclose or adequately disclose to consumers that additional fees apply to delivery orders when knowledge of the additional fees would be material to consumers in deciding to place delivery orders through Grubhub, thereby suppressing or omitting a material fact with the intent that consumers rely upon that suppression or omission;

      C.     Misrepresenting directly or indirectly, expressly or by implication, the true cost of Grubhub's food delivery services to Illinois consumers by failing to disclose or adequately disclose to consumers the additional fees it applies on delivery orders;

      D.     Misrepresenting directly or indirectly, expressly or by implication, through advertisements, marketing, and offers for the sale of food delivery services, that Illinois consumers who purchase Grubhub+ subscriptions will receive free deliveries for food orders;

      E.     Failing to disclose or adequately disclose to Illinois consumers all applicable fees for Grubhub+ delivery orders when the fees would be material to

consumers in deciding to sign up for and place delivery orders using Grubhub+, thereby suppressing or omitting a material fact with the intent that consumers rely upon that suppression or omission;

F.      Misrepresenting directly or indirectly, expressly or by implication, the benefits offered to Illinois consumers by failing to disclose or adequately disclose all applicable fees for Grubhub+ subscribers' delivery orders;

G.      Denying consumers access to consumers' Grubhub gift card funds by, among other methods, canceling the consumers' orders, blocking consumers from completing new orders, preventing consumers from transferring gift card balances to other accounts, and refusing to provide refunds for the withheld gift card funds, which conduct is unfair, oppressive, offends public policy, and causes substantial injury to consumers that cannot reasonably be avoided;

H.      Misrepresenting directly or indirectly, expressly or by implication, that Grubhub delivery services share a sponsorship, approval, status, affiliation, or connection, with Unaffiliated Restaurants;

I.      Advertising that drivers are likely to earn an inflated and atypical hourly compensation rate that is substantially more than the typical hourly compensation rate, thereby suppressing or omitting a material fact, with the intent that prospective Illinois Grubhub drivers rely upon that misrepresentation, suppression or omission;

J.      Misrepresenting directly or indirectly, expressly or by implication, the amount a prospective Grubhub driver can expect to earn, by advertising that drivers are likely to earn an inflated and atypical hourly compensation rate that is substantially more than the typical hourly compensation rate; and

K.      Obstructing and impeding, consumer attempts to cancel recurring charges,

imposed by Defendants on consumers' credit or debit cards, or other accounts, which conduct is unfair, oppressive, offends public policy, and causes substantial injury to consumers that cannot reasonably be avoided.

<u>**Count XI (by Plaintiff State of Illinois)**</u>
**Violations of the Illinois Uniform Deceptive Trade Practices Act**

226.    Defendants, in the course of a business, vocation, or occupation, have in numerous instances engaged in deceptive trade practices in violation of Section 2 of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, by:

A.    Creating Grubhub listings for restaurants and processing consumers' orders in the guise of those restaurants, without the restaurants' knowledge or consent, and causing a likelihood of confusion or misunderstanding among Illinois consumers as to the source, sponsorship, approval, or certification of the goods or services, in violation of 815 ILCS 510/2(a)(2).

B.    Creating Grubhub listings for restaurants and processing consumers' orders in the guise of those restaurants, without the restaurants' knowledge or consent, causing a likelihood of confusion or misunderstanding among Illinois consumers as to Grubhub's affiliation, connection, or association with the unaffiliated restaurants, in violation of 815 ILCS 510/2(a)(3).

C.    Creating Grubhub listings for restaurants and processing consumers' orders in the guise of those restaurants, without the restaurants' knowledge or consent, representing that Grubhub's delivery services have the sponsorship or approval of unaffiliated restaurants when, in truth and in fact, they do not, in violation of 815 ILCS 510/2(a)(5).

D.    Creating Grubhub listings for restaurants and processing consumers' orders in the guise of those restaurants, without the restaurants' knowledge or consent,

representing that unaffiliated restaurants have an affiliation or connection with Grubhub when, in truth and in fact, they do not, in violation of 815 ILCS 510/2(a)(5).

E.      Advertising that Grubhub+ subscribers will receive free delivery services when, in truth and in fact, Defendants bait consumers with claims of free delivery while assessing other fees to cover the cost of delivery, thus making false and misleading statements of fact concerning the existence and amount of price reductions, in violation of 815 ILCS 510/2(a)(11).

F.      Advertising that Grubhub+ subscribers will receive free delivery services when, in truth and in fact, Defendants bait consumers with claims of free delivery while assessing other fees to cover the cost of delivery, thus causing a likelihood of confusion or misunderstanding among Illinois consumers who hold Grubhub+ subscriptions, in violation of 815 ILCS 510/2(a)(12).

G.      Representing to consumers that they will pay a lesser amount for Grubhub's delivery services than the actual amount charged, causing a likelihood of confusion or misunderstanding in regards to delivery costs among Illinois consumers who place orders through Grubhub, in violation of 815 ILCS 510/2(a)(12).

H.      Failing to disclose or adequately disclose to consumers all additional fees charged for and applied to their delivery orders, causing a likelihood of confusion or misunderstanding among Illinois consumers who place orders through Grubhub, in violation of 815 ILCS 510/2(a)(12).

I.      Advertising that drivers are likely to earn an inflated and atypical hourly compensation rate substantially in excess of the hourly rate earned by a typical Illinois driver during the advertised time period, causing a likelihood of confusion or misunderstanding among prospective Illinois Grubhub drivers, in violation of 815 ILCS

510/2(a)(12).

## CONSUMER INJURY

227.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, ROSCA, the Impersonation Rule, the Illinois Consumer Fraud Act, and the Uniform Deceptive Trade Practices Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC and the State of Illinois request that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, the Impersonation Rule, the Illinois Consumer Fraud Act, and the Illinois Uniform Deceptive Trade Practices Act;

B.     Award monetary and other relief within the Court's power to grant;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the Illinois Consumer Fraud Act and the Illinois Uniform Deceptive Trade Practices Act, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D.     Require Defendants to pay a civil penalty in the amount of $50,000 for each deceptive and unfair act or practice done in violation of the Consumer Fraud Act and an additional penalty of $50,000 for each violation the Court finds that Defendants committed with the intent to defraud, pursuant to 815 ILCS 505/7(b);

E.     Require Defendants to pay an additional civil penalty of $10,000 for each violation of the Illinois Consumer Fraud Act found to have been committed against a senior citizen, pursuant to 815 ILCS 505/7(c);

F.    Award Plaintiffs the costs of bringing this action; and

G.    Award any additional relief as the Court determines to be just and proper.

Dated: 12/17/24

Respectfully submitted,

**FOR THE FEDERAL TRADE COMMISSION:**

CLAIRE E. W. STEWART
LISA W. BOHL
KATHARINE ROLLER
Federal Trade Commission
Midwest Region
230 South Dearborn Street, Room 3030
Chicago, Illinois 60604
(312) 960-5634 [telephone]
(312) 960-5600 [facsimile]
cstewart@ftc.gov
lbohl1@ftc.gov
kroller@ftc.gov

FEDERAL TRADE COMMISSION

**FOR THE PEOPLE OF THE STATE OF ILLINOIS:**

KWAME RAOUL
Attorney General

GREG GRZESKIEWICZ
THOMAS P. JAMES
WILTON A. PERSON
WILLIAM S. WINGO
Office of the Illinois Attorney General
Consumer Fraud Bureau
115 S. LaSalle Street, 26th Floor
Chicago, Illinois 60603
Greg.Grzeskiewicz@ilag.gov [email, Grzeskiewicz]

Thomas.James@ilag.gov [email, James]
Wilton.Person@ilag.gov [email, Person]
William.Wingo@ilag.gov [email, Wingo]
(312) 814-2218 [phone, Grzeskiewicz]
(773) 590-7944 [phone, James]
(224) 252-6458 [phone, Person]
(773) 758-4569 [phone, Wingo]